Thomas E. BOWEN, Plaintiff-Appellant,

v.

UNITED STATES of America, Defendant-Appellee.

No. 77–1009.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 26, 1977.

Decided Feb. 9, 1978.

Rehearing and Rehearing In Banc Denied May 24, 1978.

---

George M. Fleming, Tom Davis, Austin, Tex., Wallace Craig, Hurst, Tex., for plaintiff-appellant.

Morton Hollander, Michael H. Stein, Attys., Dept. of Justice, Washington, D. C., for defendant-appellee.

Before CASTLE, Senior Circuit Judge, and PELL and TONE, Circuit Judges.

TONE, Circuit Judge.

In this action under the Federal Tort Claims Act, the pilot of a private aircraft alleges that, during his flight from Texas to Indiana, which included a stop in Arkansas, air traffic control personnel employed by the United States at airports in various states negligently failed to warn him of icing conditions that ultimately caused the aircraft to crash while he was attempting to land at an airport in Indiana.[1] The controlling issue is whether a determination in a license suspension proceeding by the National Transportation Safety Board that he violated Federal Aviation Rules by flying an aircraft without deicing equipment into known icing conditions establishes contributory negligence by collateral estoppel and precludes recovery. To decide this issue we must determine whether federal common law or state law controls, and, if the latter, which state law. We hold that Indiana law controls, and that under that law, the District Court's summary judgment for the United States based on collateral estoppel was correct.

Although the district judge conducted a trial, he disposed of the case after the trial by granting the motion of the United States for summary judgment, which he had taken under advisement before hearing

---

1. Although plaintiff was a Texas resident when the crash occurred, he resided in the Southern District of Illinois when he filed this action, making venue in that district proper under 28 U.S.C. § 1402(b).

the evidence. The uncontested facts upon which the summary judgment was based were stated in his unpublished decision and order as follows:

. . . On December 22, 1972, plaintiff was the pilot and sole occupant of a Bellanca Viking aircraft on a flight from Mineral Wells, Texas, to Marion, Indiana, with an intermediate fuel stop at Flippen, Arkansas. He was then the holder of an FAA pilot's license, with commercial pilot privileges.

Prior to his departure from Mineral Wells, plaintiff did receive and record for his use in the flight certain weather information. The segment of flight to Flippen, Arkansas, was conducted under Visual Flight Rules. While at Flippen, plaintiff contacted an FAA Flight Service Station and obtained a weather briefing for the segment of his flight to Marion. Thereafter he filed an Instrument Flight Rules Plan and received clearance from the Memphis Air Traffic Control Center for his flight to Marion at an assigned altitude of 5000 feet.[2] Throughout substantially all of the Flippen-Marion flight segment, plaintiff was flying above cloud cover, extending upward to about 3000 feet above mean sea level. During the course of that segment of his flight, plaintiff was in radio contact with various air traffic control facilities at Memphis, Kansas City and Indianapolis, and air approach control at Grissom Air Force Base for his attempted landing at Marion. He also made contact with Vandalia, Illinois, radio and Terre Haute, Indiana, radio requesting weather information. Plaintiff did receive weather information from certain of those government facilities.

As he neared the termination of the Flippen-Marion IFR segment of his flight, plaintiff contacted Grissom Flight Control for clearance to land at Marion. He was given a summary of the Grissom weather conditions,[3] as no "landing" information for Marion was available. Plaintiff was given clearance for an instrument landing at Marion. Because of the failure of an essential instrument on the aircraft, plaintiff's first approach to Marion was unsuccessful. Thereafter, he requested and received from Grissom orientation as to his position, after which he attempted a second approach. The second approach terminated about 500 feet to the west from the assigned runway when the aircraft crashed because of ice accumulated thereon.

The aircraft was not equipped with deicing equipment, and operation of the aircraft in "known icing conditions" was prohibited by the approved flight manual therefor.

The complaint is grounded upon the theory that the crash and plaintiff's injuries sustained therein proximately resulted from the negligent failure of FAA agents and Air Force personnel to advise plaintiff of icing conditions existing in the vicinity of Marion.

On August 10, 1973, the FAA suspended plaintiff's pilot's license for a period of thirty days. Upon an appeal from that determination, a hearing was held before an Administrative Law Judge of the NTSB, commencing on December 11, 1973. That hearing was concluded by an order finding that plaintiff had been aware of the possibility of icing conditions before he departed from Mineral Wells, and was further advised thereof in his weather briefing at Flippen, Arkansas, and that he had violated FAA regulations in operating the aircraft in violation of flight limitations placed upon the craft itself and in operating the craft in a careless manner. The order modified the FAA determination by reducing the period of suspension to fifteen days.

An appeal taken to the NTSB was terminated on May 22, 1974 by an order

---

[2.] Hereinafter, VFR and IFR are employed to denote Visual Flight Rules and Instrument Flight Rules, respectively.

[3.] " * * * Grissom weather measured 500 overcast, visibility 4 miles fog, wind is calm. We have no landing information for Marion * * *."

affirming the suspension, and an order on September 5, 1974 denying a petition for reconsideration. . . .

\* \* \* \* \* \*

On conflicting testimony, NTSB found that plaintiff had information as to the possibility of icing in a multistate area including Indiana prior to his departure from Mineral Wells; that plaintiff was advised at Flippen of the substance of the then current Chicago weather forecast of occasional moderate and chance of severe mixed icing in clouds in the lower Ohio Valley region, and advisement that the freezing level would be at or near the surface in the Great Lakes states; that he was then advised of the substance of a Chicago aviation warning forecast of isolated severe and mixed icing in clouds in the Indiana area, among others, from 10 a. m. to 3 p. m.; that plaintiff did not receive from any source a Chicago advisory issued at about the time he left Flippen, which contained further and extended information regarding possible icing; that, notwithstanding that omission, plaintiff was in possession of weather information which put him on notice that he could expect to encounter icing conditions upon his intended flight path; and that, in the light of that knowledge available to him, plaintiff did violate FAR § 91.9 by operating his aircraft "in a careless or reckless manner," and FAR § 91.3(a) by entering into the cloud cover when there was known to him the possibility of icing, in violation of FAA operating limitations for his aircraft.

In the context of the latter rule, the Board refused to limit the phrase, "known icing conditions," to knowledge that icing had, in fact, been encountered. It held that the phrase included a pilot's knowledge of facts from either reported or forecast conditions which would reasonably lead a prudent person to expect that icing conditions did exist.

Thus the administrative determination rests upon the factual determination that plaintiff had been provided with suffi-

cient information to lead him to anticipate that he would encounter icing conditions in clouds at Marion, and that he did enter into clouds at an altitude of some 3400 feet for his approach to Marion, despite his possession of such information and despite his knowledge that his craft was neither equipped nor approved for operation in icing conditions.

\* \* \* \* \* \*

Plaintiff having failed to pursue his statutory right to judicial review of the suspension order under 49 U.S.C. § 1486(a), the NTSB adjudication that the plaintiff had violated the regulations was a final administrative order.

The District Court reasoned that the doctrine of collateral estoppel precluded plaintiff from relitigating the issue of whether he violated the safety regulations by flying his aircraft into known icing conditions, an issue that had been finally determined adversely to him in the administrative proceeding; that the violation amounted to contributory negligence as a matter of law; and that, because under Indiana law, which the court found to be controlling, contributory negligence was an absolute defense, the United States was entitled to summary judgment.

I.

The Federal Tort Claims Act makes the United States liable for injury "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b); see also, 28 U.S.C. §§ 2672 and 2674. The Supreme Court, in *Richards v. United States*, 369 U.S. 1, 8–10, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962), rejected the argument that the applicable law is that of the state where the operative effect of the act or omission occurred,[4] and applied the statutory language

---

4. Under the traditional rule of *lex loci delicti commissi*, when the defendant's act or omission occurs in one jurisdiction and the harm to the plaintiff occurs in another, the law of the latter is applied. See R. Weintraub, *Commentary on the Conflict of Laws* 200 (1971).

literally. *Richards* also held that the whole law, including choice-of-law rules, of the state where the act or omission occurred was to be applied. *Id.* at 10–15.

## II.

Notwithstanding *Richards*, plaintiff argues that the federal government's massive regulation of the nation's airways has preempted the field of aviation law, and that therefore federal common law, which should include the doctrine of comparative negligence, should be applied. Reliance is placed upon *Kohr v. Allegheny Airlines, Inc.*, 504 F.2d 400 (7th Cir. 1974), *cert. denied*, 421 U.S. 978, 95 S.Ct. 1980, 44 L.Ed.2d 470 (1975). This argument was concededly not presented to the District Court and therefore need not be considered by us.[5] *Youker v. Gulley*, 536 F.2d 184, 186–187 (7th Cir. 1976).

■ We do not rest our rejection of the argument on that ground alone, however. Although *Kohr* held that a federal rule of contribution and indemnity among joint tort-feasors should control in aviation collision cases, and that rule applied to claims of the United States for contribution and in-

demnity, the court did not have before it the question of whether the law referred to in the Federal Tort Claims Act, *viz.*, "the law of the place where the act or omission occurred," is federal law or state law.[6] The *Richards* case, which antedated *Kohr* and involved facts very similar to those in the case at bar, expressly holds that the law to which the statutory phrase refers is state law.

In addition, dictum more recent than *Kohr* in *Miree v. DeKalb County*, 433 U.S. 25, 97 S.Ct. 2490, 2494 n. 4, 53 L.Ed.2d 557 (1977), strongly suggests that the Supreme Court is still of the view that state law governs in aviation tort claims brought under the Federal Tort Claims Act.[7] Moreover, the Court's disposition of one of the arguments made in *Miree* is significant. The argument was that federal common law rather than Georgia law should control on the issue of whether the contract between the FAA and the county gave third-party beneficiary rights to the public (see note 7, *supra*), because the United States "has a substantial interest in regulating aircraft travel and promoting air travel safety." 97 S.Ct. at 2495. The Court re-

5. Plaintiff's argument that the question of whether to apply the Arkansas comparative negligence rule was before the trial court does not of course answer this point.

6. The claims before this court in *Kohr* were third-party claims for indemnity and contribution and thus did not themselves arise under the Federal Tort Claims Act. A claim under the Act was pending before the District Court in that case, and is now before this court in an appeal which has been orally argued but not decided. *Kohr v. Allegheny Airlines, Inc.*, Nos. 76–2289 and 76–2290.

7. In *Miree* diversity actions were brought by survivors of deceased passengers, the assignee of the aircraft owner, and a burn victim against the county, alleging that the county had violated a contract with the Federal Aviation Administration by operating a garbage dump adjacent to the airport; that birds swarming from the dump and ingested into the aircraft's jet engines had caused the crash; and that plaintiffs were third-party beneficiaries of the contract. The district court dismissed the action on the county's motion. The Fifth Circuit, in banc, held that because the United States was a party to the contract, and the contract was entered

into pursuant to authority conferred by federal statute, the federal interest in uniformity of decision. *Clearfield Trust Co. v. United States*, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943), required that federal common law control the contract's interpretation; and under that law the plaintiffs, as third-party beneficiaries, did not have a cause of action against the county. 538 F.2d 643, adopting panel dissent, 526 F.2d 679, 686. The Supreme Court held that Georgia law applied and remanded for a determination of whether that law gave plaintiffs rights under the contract. Although the plaintiffs had also sued the United States under the Federal Tort Claims Act, that claim was not before the Supreme Court. See 97 S.Ct. at 2492 n. 1. In that Court's opinion, the statement in the text, "the resolution of petitioners' [plaintiffs'] breach of contract claim against respondent will have no direct effect upon the United States or its Treasury," is footnoted as follows:

There is no indication that petitioners' tort claim against the United States, . . . will be affected by the resolution of this issue. Indeed, the Federal Tort Claims Act itself looks to state law in determining liability. 28 U.S.C. § 1346(b).

jected this argument, stating that this federal interest was insufficient, "given the narrow question before us, to call into play the rule of *Clearfield Trust*," *i. e.*, the rule that federal law controls when the interest of the United States in national uniformity in the law is exceptional, see note 7, *supra*. The Court then quoted the following passage from *Wallis v. Pan American Petroleum Corp.*, 384 U.S. 63, 68, 86 S.Ct. 1301, 1304, 16 L.Ed.2d 369 (1966):

> In deciding whether rules of federal common law should be fashioned, normally the guiding principle is that a *significant conflict between some federal policy or interest and the use of state law in the premises must first be specifically shown.* It is by no means enough that, as we may assume, Congress could under the Constitution readily enact a complete code of law governing transactions in federal mineral leases among private parties. Whether latent federal power should be exercised to displace state law is primarily a decision for Congress. [Emphasis added by Court in *Miree*, 97 S.Ct. at 2495.]

Also, the Supreme Court's unwillingness to extend federal admiralty jurisdiction and the concomitant uniform federal admiralty law to aviation accidents in *Executive Jet Aviation, Inc. v. City of Cleveland*, 409 U.S. 249, 273–274, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972), is not without significance, especially when considered in the light of *Miree*.

In the face of these indications of the Supreme Court's views, we are not free to extend *Kohr* to an action under the Federal Tort Claims Act. The law referred to in that Act is, as *Richards* holds, state law.

### III.

*Richards* sheds no light on the question of which state law applies when, as here, the act or omission occurs in more than one state. The District Court found it unnecessary to address this question, because, in its view, applying the law of any of the three states in which it believed the negligence might have occurred, Indiana, Illinois, or Arkansas, would lead to the same result.[8] This was so, the court reasoned, even though the substantive law as to the effect of plaintiff's fault was comparative negligence in Arkansas[9] but contributory negligence in both Illinois and Indiana,[10] because (a) the whole law of the place where the act or omission occurred, including its choice-of-law rules, is to be applied under *Richards*; (b) the applicable choice-of-law rule of each of those states, the court believed, was *lex loci delicti*;[11] and under this rule Indiana substantive law governed, including the contributory negligence doctrine.

We reach the same result, but, because of an intervening change in the Arkansas choice-of-law rule, by different reasoning. A recent choice-of-law decision of the Arkansas Supreme Court indicates that the court might apply the substantive law of Arkansas[12] rather than Indiana. Thus, if

---

**8.** In his complaint, plaintiff also alleged that negligence occurred in Texas and Kansas, but he does not contend that the law of either of those states applies.

**9.** Ark.Stat.Ann. §§ 27–1763–1765 (Suppl.1975).

**10.** *Huey v. Milligan*, 242 Ind. 93, 97, 175 N.E.2d 698, 700 (1961); *Maki v. Frelk*, 40 Ill.2d 193, 195–196, 239 N.E.2d 445, 447 (1968).

**11.** See note 4, *supra*. The court cited *Horvath v. Davidson*, 148 Ind.App. 203, 264 N.E.2d 328 (1970); *McGinty v. Ballentine Produce, Inc.*, 241 Ark. 533, 408 S.W.2d 891 (1966); and *Millsap v. Central Wisconsin Motor Transport Co.*, 41 Ill.App.2d 1, 189 N.E.2d 793 (1963). As to Illinois, however, *Ingersoll v. Klein*, 46 Ill.2d 42, 262 N.E.2d 593 (1970) would seem to be controlling, but neither side challenges the District

Court's view of the Illinois rule, and the point is academic in any event.

**12.** *Wallis v. Mrs. Smith's Pie Co.*, Ark., 550 S.W.2d 453 (1977). In that case the plaintiff's Arkansas citizenship appears to have influenced the decision to apply the Arkansas comparative negligence rule when the accident occurred in Missouri (although the Missouri rules of the road were held applicable). Ark., 550 S.W.2d at 458. We cannot be sure the Arkansas court would reach the same result here, where the plaintiff was a non-resident, but the possibility that it would is sufficiently great to make it appropriate for us to decide whether the Federal Tort Claims Act invokes Arkansas law.

Arkansas is "the place where the act or omission occurred," the Federal Tort Claims Act, in combination with that state's "governmental interest" choice-of-law rule, the Arkansas comparative negligence rule may be applicable.

## IV.

■ Inasmuch as the legal quality of conduct alleged to have caused injury to the plaintiff is not determined until the end of the trial, and the trier of fact must know which law is applicable in order to make that · determination, the statutory phrase "the place where the act or omission occurred" necessarily refers to the situs of conduct that is asserted to be actionable, rather than the situs of the part of that conduct that is ultimately determined to be actionable.[13]  No cases deciding which state law is to be applied when the allegedly negligent conduct occurred in more than one state have been called to our attention, · and we have found none.[14]

■ The choice is limited at the outset by the words of the Act, which as *Richards* held, preclude the borrowing of the place-of-impact rule that has evolved as part of the traditional rule of *lex loci delicti*.  The Act's focus upon only the acts or omissions themselves also rules out the significant contacts rule of the *Restatement (Second) Conflict of Laws* or any variant of that rule.[15]  Excluding possibilities that would appear to be wholly arbitrary leaves the alternatives of the place of the last act or

omission having a causal effect, or the place of the act or omission having the most significant causal effect.  The former would have the advantage of certainty, as does the traditional conflicts rule of *lex loci delicti*, but the latter seems to us to be more consistent with the statutory language and Congress' intent.  In this case, however, the law of Indiana governs if either interpretation is adopted, for the acts or omissions in Indiana were not only the last in time but had a more significant causal relationship to the injury than those occurring in any other state.

The relative importance of the Indiana events becomes apparent when it is recalled that flight control personnel in that state were responsible for giving plaintiff the information he would need to complete his journey by landing there.  It was they who gave him clearance for an instrument landing at Marion and a summary of weather conditions at Grissom Air Force Base, with the further information that they had "no landing information for Marion."  They also gave him orientation as to his position before his attempt at a second approach.[16]  At least the acts or omissions that occurred in other states had no more causal significance than those that occurred in Indiana, and the close relationship of the Indiana events to the crash itself and the fact that what was said there could have prevented the crash seem to us to give that state the edge as the situs of the acts or omissions having the greatest causal significance.[17]

---

13.  In the unusual case in which there is a dispute over where that conduct occurred, that fact issue would have to be decided by the trier of fact before it could be determined which law to apply.

14.  Cases have arisen where negligent acts or omissions have occurred in more than one state, but where it was unnecessary, as in the view of the District Court it was in this case, to decide the choice-of-law question. *E. g., In re Silver Bridge Disaster Litigation*, 381 F.Supp. 931 (S.D.W.Va.1974); *Kantlehner v. United States*, 279 F.Supp. 122 (E.D.N.Y.1967).

15.  See *Restatement (Second) Conflict of Laws* § 145, *et seq.*  See also R. Weintraub, *Commentary on the Conflict of Laws* 201–210 (1971);

*Wallis v. Mrs. Smith's Pie Co.*, Ark., 550 S.W.2d 453, 456 (1977).

16.  The act or omission referred to in the statute is that of the employee of the United States, so we do not rely upon the fact that Indiana was the situs of the most significant conduct of plaintiff.  If he was guilty of contributory negligence, the most significant part of that negligence was his persistence in attempting to land despite having received weather information that put him on notice of the danger of icing at Marion.

17.  Cf. *Restatement (Second) Conflict of Laws* § 146, which states that, as a general rule, in personal injury choice-of-law problems, the law of the state where the injury occurred will

## V.

Having determined that the Federal Tort Claims Act refers us to Indiana law, and remembering that under *Richards* the whole of that law, including choice-of-law rules, is to be applied, the next step is the application of the Indiana choice-of-law rule. The District Court held that rule to be *lex loci delicti.* Plaintiff does not question this ruling in his brief, and the brief of the United States proceeds on the assumption that it is correct. With the case in this posture, we make the same assumption,[18] noting that the result would be the same even if the significant contacts rule of the *Restatement (Second)* were applied.[19] In either event, the applicable substantive law is that of Indiana, which includes the rule that contributory negligence is an absolute defense. See note 10, *supra.* Accordingly, if plaintiff was collaterally estopped from denying contributory negligence, summary judgment for the United States was proper.

## VI.

The issue of whether the final administrative determination of plaintiff's negligence can be asserted as a bar under the doctrine of collateral estoppel in a subsequent judicial proceeding is a question of Indiana law divisible into two parts: First, was plaintiff's negligence established in the administrative proceeding?[20] Second, if it was, is the administrative agency's determination a proper basis for collateral estoppel?[21]

### A.

The District Court did not, nor need we, decide whether flying an aircraft not equipped for deicing into known icing conditions and attempting to land in those conditions is, standing alone, contributory negligence as a matter of law. That conduct was found by the NTSB to be a violation of regulations promulgated for safety purposes. Compare 49 U.S.C. § 1348(c) with F.A.R. 91.9, 91.31(a); 14 C.F.R. §§ 91.9, 91.31(a) (1977). Indiana has, by statute, incorporated federal air safety regulations as its own standards of care. *Cf.* Ind.Code § 8–21–4–8 (1976). Finally, under Indiana law violation of a safety-oriented

normally be applied, unless some other state has a "more significant relationship" to the occurrence and the parties than that state.

18. This court, however, has held the Indiana rule to be most significant contacts. *Watts v. Pioneer Corn Co.,* 342 F.2d 617 (7th Cir. 1965); *Gianni v. Ft. Wayne Air Service, Inc.,* 342 F.2d 621 (7th Cir. 1965). As noted in *Watts,* 342 F.2d at 620, the Indiana Supreme Court pioneered the significant contacts approach in contract cases in *W. H. Barber Co. v. Hughes,* 223 Ind. 570, 585–586, 63 N.E.2d 417, 423 (1945). See also *State Automobile Mutual Ins. Co. v. Spray,* 547 F.2d 397, 400 (7th Cir. 1977) (validity of insurance contract); *Norfolk & Western Ry. v. Hartford Accident & Indemnity Co.,* 420 F.Supp. 92, 94 (N.D.Ind.1976) (whether an insurance policy covers punitive damages). The Appellate Court's adoption of the contacts approach in *Witherspoon v. Salm,* 142 Ind.App. 655, 666–671, 237 N.E.2d 116, 122–125 (1968), appears to have lost its status as authority on the choice-of-law issue by a disclaimer in the Indiana Supreme Court's opinion reversing on other grounds. 251 Ind. 575, 580, 243 N.E.2d 873, 878 (1969). See *Horvath v. Davidson,* 148 Ind.App. 203, 209, 264 N.E.2d 328, 332 (1970). A later case, *Chicago South Shore & South Bend Railroad v. Brown,* 320 N.E.2d 809, 812 (Ind.App.1974), appears to apply *lex loci delicti* and does not discuss the choice-of-law question because the parties did not raise it.

19. Even under that rule the facts that Indiana is the situs of the injury and the most significant part of the contributory negligence, see note 16, *supra,* strongly militates in favor of applying Indiana law. See *Restatement (Second) Conflict of Laws* §§ 146 (n. 17, *supra* ) and 164(2) and Comment *b* to the latter section.

20. Holding that this question must be determined by reference to state law are *Gilsoul v. United States,* 347 F.2d 730, 733 (7th Cir. 1965); *Lightenburger v. United States,* 298 F.Supp. 813, 837–838 (C.D.Cal.1969), *rev'd on other grounds,* 460 F.2d 391 (9th Cir. 1969); *Smith v. United States,* 334 F.Supp. 185, 187–188 (D.Minn.1971).

21. Holding that this question also is to be determined by reference to state law are *Filice v. United States,* 271 F.2d 782, 783 (9th Cir. 1959); *D'Ambra v. United States,* 396 F.Supp. 1180, 1181 (D.R.I.1973), *aff'd,* 518 F.2d 275 (1st Cir. 1975); *State of Maryland v. Capital Airlines,* 267 F.Supp. 298, 302–303 (D.Md.1967).

statute or regulation is negligence *per se.*[22] Contributory negligence as a matter of law was therefore established.

### B.

■ The final question that must be answered to complete our analysis is whether under Indiana law the NTSB's final decision is a proper basis for collateral estoppel. In *Amann v. Tankersley*, 149 Ind.App. 501, 273 N.E.2d 772 (1971), the Indiana Appellate Court outlined the essential elements which are "generally required" for the application of the doctrine of collateral estoppel:

(a) a suit and an adversary proceeding
(b) a final judgment
(c) a decision on the merits
(d) rendered by a court of competent jurisdiction
(e) identity of parties
(f) identity of subject matter or issues
(g) capacity of parties
(h) mutuality of estoppel.

149 Ind.App. at 509, 273 N.E.2d at 777.

Apart from the fact that the prior decision was by an administrative agency rather than a court, all these essential elements are satisfied: (a) The proceedings were adversary in nature, (b) the functional equivalent of (c) a final decision on the merits (d) was entered by a tribunal of competent jurisdiction, and (g) the parties had capacity to litigate the issues. Also, (f) the pertinent issues are the same in both cases, *viz.,* whether plaintiff received weather information that should have alerted a reasonably prudent pilot that icing conditions would be encountered, and, if so, whether plaintiff violated F.A.R. 91.9 and 91.31(a) by thereafter acting as he did. In addition, (e) the identity of parties requirement is satisfied, because the United States and its agency are in privity for collateral estoppel purposes. *Sunshine Coal Co. v. Adkins*, 310 U.S. 381, 402–403, 60 S.Ct. 907, 84 L.Ed. 1263 (1940); *Mathis v. Laird*, 457 F.2d 926, 927 (5th Cir. 1972). Finally, (h) the mutuality of estoppel requirement is satisfied. There is no reason that the United States would not likewise have been estopped had the relevant facts been adjudicated in favor of plaintiff in the administrative proceeding.[23]

We turn now to the more difficult question of whether Indiana would accord collateral estoppel effect to the decision of an administrative agency. The reported Indiana cases involve judgments of courts; we have found no decision either way dealing with an administrative determination.[24] In the absence of controlling Indiana decisions, we are to decide the question as we believe the Indiana courts would decide it. *Huff v. White Motor Corp.*, 565 F.2d 104, 106 (7th Cir. 1977); *D'Ambra v. United States*, 396 F.Supp. 1180, 1181 (D.R.I.1973); *aff'd*, 518 F.2d 275 (1st Cir. 1975).

The policy underlying the doctrine of res judicata, of which collateral estoppel is a part,[25] is stated in § 1 of the *Restatement of Judgments* (1942):

> Where a reasonable opportunity has been afforded to the parties to litigate a claim before a court which has jurisdiction over the parties and the cause of action, and

---

**22.** *Larkins v. Kohlmeyer*, 229 Ind. 391, 398, 98 N.E.2d 896, 900 (1951). Most other American jurisdictions follow the same rule. Prosser, *Law of Torts*, § 36 (4th ed. 1971). Impossibility of compliance, an exception to the rule under *Larkins*, 229 Ind. at 398–399, 98 N.E.2d at 900, is not urged here.

**23.** Because an NTSB order suspending a pilot's license is not a report within the meaning of 49 U.S.C. § 1441(e), plaintiff's reliance on that provision's prohibition against admission in evidence or use of such a report in a subsequent suit is misplaced. License suspension proceedings under 49 U.S.C. § 1429, such as the one against plaintiff here, are different from the

investigation dealt with in 49 U.S.C. § 1441. See *Air East, Inc. v. NTSB*, 512 F.2d 1227, 1229 & nn. 2–4 (3rd Cir.), *cert. denied*, 423 U.S. 863, 96 S.Ct. 122, 46 L.Ed.2d 92 (1975); *Pangburn v. C.A.B.*, 311 F.2d 349, 355–356 (1st Cir. 1962).

**24.** An intimation, however, that the doctrine may be extended to the decision of an administrative agency in an appropriate case appears in *Braughton v. Metropolitan Board of Zoning Appeals*, 146 Ind.App. 652, 657–658, 257 N.E.2d 839, 842–843 (1970).

**25.** See *Restatement (Second) Judgments* xv, (Tent.Draft No. 1, 1973).

the court has finally decided the controversy, the interests of the State and of the parties require that the validity of the claim and any issue actually litigated in the action shall not be litigated again by them.

The time when courts were unwilling to extend the doctrine to administrative determinations, *Pearson v. Williams*, 202 U.S. 281, 284–285, 26 S.Ct. 608, 50 L.Ed. 1029 (1906), has long since passed. By 1958, Professor Kenneth Culp Davis was able to say that "[t]he courts generally follow this sound view," which he stated as follows:

> The reasons against a second litigation between the same parties of the same claims or issues are precisely the same for some administrative determinations as they are for most judicial determinations. The sound view is therefore to use the doctrine of res judicata when the reasons for it are present in full force, to modify it when modification is needed, and to reject it when the reasons against it outweigh those in its favor. [Footnote omitted.]

2 K. Davis, *Administrative Law Treatise* 548 (1958).[26] In 1966 the Supreme Court applied the doctrine to an administrative determination, stating

> When an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply res judicata to enforce repose.

*United States v. Utah Construction & Mining Co.*, 384 U.S. 394, 422, 86 S.Ct. 1545, 1560, 16 L.Ed.2d 642 (1966). Relitigation of factual issues determined by the Advisory Board of Contract Appeals was precluded in that case because "the Board was acting in a judicial capacity" when it considered those issues, the issues were "relevant to issues properly before" the Board, "and both parties had a full and fair opportunity to argue their version of the facts and an opportunity to seek court review of any adverse findings." The Court concluded,

> There is, therefore, neither need nor justification for a second evidentiary hearing on these matters already resolved as between these two parties.

*Id.* With the *Utah Construction* decision leading the way, the courts have continued to extend the doctrine of res judicata to the decisions of administrative agencies in appropriate cases. See K. Davis, *Administrative Law* 1970 Supplement 609–623 (1971); K. Davis, *Administrative Law of the Seventies* 427–434 (1976) ("As of 1975, the main contours of the law of administrative res judicata are precisely what the 1958 Treatise proposed.") and 1977 Supplement 144–146; and see Note, *The Collateral Estoppel Effect of Administrative Agency Actions in Federal Civil Litigation*, 46 Geo.Wash.L. Rev. 65 (1977).[27]

In dealing with prior judicial adjudications, the courts have not hesitated in recent years to expand the application of the collateral estoppel, or issue preclusion,

**26.** See also Vestal, *Preclusion/Res Judicata Variables: Adjudicating Bodies*, 54 Geo.L.Rev. 857, 874 (1966); Groner & Sternstein, *Res Judicata in Federal Administrative Law*, 39 Iowa L.Rev. 300, 314–316 (1954).

**27.** This trend is observable in the state courts as well. See *Campbell v. Superior Court*, 18 Ariz.App. 287, 501 P.2d 463, 466 (1972); *Bockman v. Arkansas State Medical Bd.*, 229 Ark. 143, 147–148, 313 S.W.2d 826, 829 (1958); *Hollywood Circle v. Dept. of Alcoholic Beverage Control*, 55 Cal.2d 728, 731–732, 13 Cal.Rptr. 104, 361 P.2d 712, 714–715 (1961); *Umberfield v. School Dist. No. 11*, 185 Colo. 165, 169–170, 522 P.2d 730, 732 (1974); *Corey v. Avco-Lycoming Division, Avco Corp.*, 163 Conn. 309, 317–318, 307 A.2d 155, 160 (1972), *cert. denied*, 409 U.S. 1116, 93 S.Ct. 903, 34 L.Ed.2d 699 (1973); *Epps Air Service v. Lampkin*, 125 Ga. App. 779, 780–781, 189 S.E.2d 127, 129 (1972); *Maquoketa Community Schl. Dist. v. George*, 193 N.W.2d 519, 520–521 (Iowa 1972); *Bd. of County Commrs. v. Racine*, 24 Md.App. 435, 445–451, 332 A.2d 306, 311–315 (1975); *Shiffer v. Bd. of Educ.*, 393 Mich. 190, 202–203, 224 N.W.2d 255, 260–261 (1974); *Ohmart v. Dennis*, 188 Neb. 260, 264, 196 N.W.2d 181, 184 (1972); *Morin v. J. H. Valliere Co.*, 113 N.H. 431, 434, 309 A.2d 153, 155 (1973); *Evans v. Monaghan*, 306 N.Y. 312, 323–324, 118 N.E.2d 452, 457–458 (1954); *Bryant v. L. H. Moore Canning Co.*, 509 S.W.2d 432, 434 (Tex.Civ. App.1974); *Bowen Trucking, Inc. v. Public Service Commn.*, 559 P.2d 954, 957 (Utah 1977) (concurring opinion).

branch of the doctrine of res judicata, with which we are concerned here, to better serve the underlying policy on which the doctrine is based, *viz.*, that one opportunity to litigate an issue fully and fairly is enough. See, *e. g., Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971); *Samuel C. Ennis & Co. v. Woodmar Realty Co.*, 542 F.2d 45, 49 (7th Cir. 1976); *Speaker Sortation Systems, Division of A–T–O Inc. v. United States Postal Service*, 568 F.2d 46, 48 (7th Cir. 1978); *Restatement (Second) Judgments* § 88 (Tent.Draft No. 2, 1975).[28] At the same time, however, there is an increasing recognition that the rules of issue preclusion should not be inexorably applied when a fair opportunity to litigate the issue in the prior proceeding was lacking. *Restatement (Second) Judgments* § 68.1 (Tent.Draft No. 4, 1977).

▬▬ In attempting, without any discernible doctrinal trend in the reported decisions of the courts of a state, to predict how those courts will decide an issue of state law when it is presented to them, a federal court may reasonably assume that they will follow the rule that appears best to effectuate the policies that underlie the rule. Here the underlying policy, *viz.*, that one fair opportunity to litigate an issue is enough, is best served by the rule that issue preclusion applies to a final administrative determination of an issue properly before an agency acting in a judicial capacity when both parties were aware of the possible significance of the issue in later proceedings and were afforded a fair opportunity to litigate the issue and to obtain judicial review.[29]

In hearing the testimony on the fact issues here, the NTSB was performing a judicial function. The critical question in the administrative hearing was credibility of witnesses. The administrative law judge believed the FAA personnel who testified that they had advised plaintiff of the likelihood of icing conditions ·in Indiana, and rejected plaintiff's testimony to the contrary, performing the same role of weighing and evaluating conflicting testimony that a trier of fact would have performed in a judicial proceeding involving the same fact issues. As Professor Davis points out, the doctrine of collateral estoppel performs "at its best" in the kind of situation presented here. 2 Davis, *supra*, § 18.03 at 559.

Although the rules of evidence are somewhat relaxed in proceedings before the NTSB, with the result, as plaintiff points out, that some hearsay may be admissible, that alone should not be determinative. The question is ultimately one of fairness. Plaintiff has not pointed to any significant evidence admitted in the administrative proceedings that would not have been admissible in court. Similarly, although the limitations on the opportunities for discovery in the administrative proceeding might produce such unfairness in a given case that issue preclusion should be denied, *cf. Restatement (Second) Judgments* § 68.-1(c) ("differences in the quality or extensiveness of the procedures followed"), plaintiff here has not pointed to any specific prejudice resulting from limitations on discovery. We are satisfied that plaintiff was afforded a full and fair opportunity in the administrative proceeding to litigate the fact issues that were controlling in both proceedings.[30]

▬▬ An additional factor remains to be considered. If, because the significance an

---

**28.** The illustrations show the application of issue preclusion to claims involving third parties, an extension of the doctrine which Indiana has probably not yet entirely embraced. *Cf. Mayhew v. Deister*, 144 Ind.App. 111, 122–123, 244 N.E.2d 448, 454–455 (1969).

**29.** We do not mean to exclude from consideration in an appropriate case other factors listed in *Restatement (Second) Judgments* § 68.1

(Tent.Draft No. 3, 1976), but the· factors we mention are those that are pertinent here.

**30.** The administrative proceeding was brought under § 609 of the Federal Aviation Act of 1958, 49 U.S.C. § 1429. Under the Congressional authority provided in § 601 of that Act, 49 U.S.C. § 1421, the National Transportation Safety Board has promulgated regulations governing proceedings brought under § 609. See 49 C.F.R., Part 821 (1976). The regulations

administrative determination would have in later court proceedings is not reasonably foreseeable, a party does not choose to litigate the common issues in the administrative proceeding, it would be unfair to hold him bound by the administrative determination. Compare *Restatement (Second) Judgments* § 68.1(e)(ii) and (iii). That is not the case here, however. Not only is suspension of a license ordinarily a matter of importance to the pilot, but the plaintiff here retained counsel and vigorously litigated the issues in the license suspension proceeding. Here, as in *Utah Construction*, 384 U.S. at 422, 86 S.Ct. at 1560, "[t]here is . . . neither need nor justification for a second evidentiary hearing" on issues already determined between the parties.

■ We therefore conclude that, under Indiana law, the plaintiff was estopped from relitigating the issue of whether his conduct violated Federal Aviation Regulations and the underlying fact issues. Because, under that law, the determination of these issues adversely to plaintiff requires the conclusion that he was negligent, and contributory negligence is an absolute bar to recovery, plaintiff could not succeed in his Federal Tort Claims Act suit. The judgment is therefore affirmed.

AFFIRMED.

provide for proceedings similar to civil court proceedings. The complaint must contain "a concise but complete statement of the facts relied upon and the relief sought," 49 C.F.R. § 821.30(b); see *id.* § 821.31, and the burden of proof to sustain a charge of violation of an F.A.R. is on the Administrator. *Id.* § 821.32. The parties are entitled to assistance of counsel, *id.* § 821.6, and parties have a clear right to introduce both oral and documentary evidence, in their case in chief or in rebuttal, and have the right to cross-examine witnesses. *Id.* § 821.38. They are entitled to take depositions and submit written interrogatories. *Id.* § 821.-19. The parties are entitled to subpoena witnesses and documents for depositions and the hearing itself. *Id.* § 821.20. Moreover, third parties may intervene if the administrative law judge determines that they may be bound or

financially affected by the adjudication. *Id.* § 821.9. The administrative law judge is required to state his findings and conclusions, as well as his grounds therefor. *Id.* § 821.42(b). A right of appeal lies from the administrative law judge's decision to the full Board, which, in reviewing the decision, considers whether the findings are supported by a preponderance of credible evidence, whether prejudicial errors occurred, and whether the decision is supported by precedent. *Id.* § 821.49. The Board's decision is reviewable as of right by the Court of Appeals. 49 U.S.C. § 1486(a).

While we do not mean to intimate that the availability of all of these procedures is always necessary before an administrative finding may be the basis for issue preclusion, their availability here strengthens the case for issue preclusion.